**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



**Dated: 01:54 PM March 9, 2017**

Russ Kendig
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| IN RE: | CHAPTER 7 |
| GLENDA DENISE CHAPMAN AND HARRY LEE CHAPMAN, | CASE NO. 15-61891 |
| | ADV. NO. 15-6110 |
| Debtors. | JUDGE RUSS KENDIG |
| KERRY EATON AND KERRY EATON, LLC, | |
| Plaintiffs, | **MEMORANDUM OF OPINION (NOT INTENDED FOR PUBLICATION)** |
| v. | |
| GLENDA DENISE CHAPMAN AND HARRY LEE CHAPMAN, | |
| Defendants. | |

    This adversary proceeding arises in the chapter 7 bankruptcy proceeding of Glenda Denise Chapman and Harry Lee Chapman (collectively "Debtors"). Plaintiffs, Kerry Eaton and Kerry Eaton, LLC (collectively "Plaintiffs"), allege in the complaint that Debtors' fraudulent conduct caused $133,356.56 in nondischargeable damages under 11 U.S.C. § 523(a)(2)(A). On December 6, 2016, the court held a trial on the matter. Based on a review of the facts and for the following reasons the courts finds that Debtors are entitled to judgment in their favor on Plaintiffs' claims under 11 U.S.C. § 523(a)(2)(A).

1

The court has jurisdiction of this case under 28 U.S.C. § 1334 and the general order of reference dated April 4, 2012. In accordance with 28 U.S.C. § 1409, venue in this district and division is proper. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

## FACTUAL BACKGROUND

Kerry Eaton is a landman in the petroleum industry. Mr. Eaton is the sole member of Kerry Eaton, LLC, a limited liability company organized in Alabama, which Mr. Eaton uses in his landman business. Mr. Eaton primarily works as an independent contractor. Mr. Eaton testified that he has been an independent landman since 1996. As a landman he goes to county courthouses and searches tax and land records to identify the ownership of land that has the potential for valuable minerals on the property.

Debtors, Harry Chapman and Glenda Chapman, are the co-owners of the two member limited liability companies, Petroleum Land Services, LLC ("PLS") and Agri Land Mineral Management, LLC ("ALMM"). PLS and ALMM are oil and gas service companies. Debtors have been in the oil and gas industry since 1993.

This adversary proceeding arises out of a dispute between the parties over work Plaintiff alleges he performed for Debtors from August 2012 through May 2013 that went uncompensated. In addition, Mr. Eaton also claims that Glenda Chapman made fraudulent misrepresentations regarding a mineral deal inducing him to make a personal loan for $10,000 that was never repaid.

The parties have very different explanations for the scope of their relationship. Plaintiff, Kerry Eaton, testified at trial. According to Mr. Eaton, he received a call from Glenda Chapman on August, 9, 2012, asking if he was available to do some work in Kansas. Glenda Chapman followed up the phone call with an email on August 15, 2012, asking Mr. Eaton to look up some leases in Ford County, Kansas. Mr. Eaton testified that on August 17, 2012, he received an email from Mrs. Chapman telling him to travel to Grove County, Kansas and look for leases that are getting ready to expire, perform some research on mineral ownership, and upload any documents or information into the provided dropbox account.

Mr. Eaton testified that the Debtors sent him an independent contractor agreement. Additionally, Plaintiffs introduced an email from Harry Chapman in which he sent Mr. Eaton an independent contractor agreement and a non-disclosure agreement. Upon receipt of the agreement, Mr. Eaton modified his daily rate to $425, signed and returned the agreement. He never received an executed copy with the Debtors' signatures, but Mr. Eaton testified that was common in his line of work. According to Mr. Eaton, he had an agreement with Debtors for him to perform landman work in Kansas at his daily rate of $425 plus mileage.

Mr. Eaton testified that he continued to work at the Debtors' direction from August 15, 2012, until September 4, 2012. Then, Debtors told Mr. Eaton to wrap things up in Kansas and

come work for them in Illinois. According to Mr. Eaton, he worked in Kansas until September 19, 2012. Mr. Eaton argues that a September 9, 2012 email that Plaintiffs introduced into evidence shows that he was continuing to work under the Debtors direction in Grove County, Kansas. In this email, Mrs. Chapman thanks him for all his work.

On October 7, 2012, Mr. Eaton arrived in Illinois. Mr. Eaton testified that Harry Chapman meet him late in the evening on October 7, 2012 and took him to an apartment where he could stay. According to Mr. Eaton, Debtors were going to pay for the rental unit. Based on a ledger created by the apartment owners, Glenn and Karin Miller, and their supporting sworn statement, Mr. Eaton rented the unit from October 2012 through May 2013. Mr. Eaton paid through March 2013 then fell behind on rent and sent the $1500 outstanding balance for April and May on March 3, 2014.

Mr. Eaton testified that he worked for Debtors in Illinois from October 8, 2012, through May 31, 2013. He worked there continuously throughout that time except for attending to his divorce in November of 2012. Mr. Eaton stated that in April of 2013 he was doing heirship research for Bankston Creek while working for ALMM. Debtors do not dispute the Mr. Eaton did heirship research in April. They do dispute the amount of time and quality of his work product.

Plaintiffs support Mr. Eaton's characterization of his working relationship with timesheets, work product Mr. Eaton states he created, and a few emails from Debtors. Mr. Eaton prepared an accounting of his time worked and mileage in preparation for a court proceeding in Hamilton County, Illinois. He created the timesheets in 2014, rather than contemporaneously with the time he allegedly worked. At trial, Mr. Eaton admitted that he made mistakes in his original accounting because it included time he did not work in September and November. After trail, Plaintiffs reduced their damage claim for unpaid work from $103,663.60 to $87,920.68 because of the mistakes on the timesheets.

Plaintiffs introduced a spreadsheet and supporting documents from research done in Grove County, Kansas. There is no supporting documentation or contemporaneously created time sheets for the work Mr. Eaton alleges he did in Illinois.

Plaintiffs introduced and Mr. Eaton testified regarding three additional emails that he argued supported his claim that there was an employment relationship. On October 31, 2012, Mrs. Chapman emailed Mr. Eaton regarding a leasehold map. On January 18, 2013, Harry Chapman sent an email to Ben Webster that Mr. Eaton claims he wrote in order to sell mineral interests. On February 11, 2013, an email from Mr. Chapman to Mr. Eaton regarding information from the Bureau of Land Management. Mr. Eaton claims that these three emails are an example of a working relationship between himself and the Debtors from October 2012 through May 2013.

On December 1, 2012, Mr. Eaton wrote a personal check to Glenda Chapman. Mr. Eaton testified that the check was a loan to help Debtors secure a mineral deed in order to earn enough money to pay him his wages. According to Mr. Eaton, on the same day, he received an email from Mrs. Chapman thanking him for all he does.

Glenda Chapman testified at trial. According to Mrs. Chapman, Mr. Eaton contacted her in July of 2012 looking for work. She returned his call on August 9, 2012, to tell him that they did not have any work for him to do. Mrs. Chapman agreed that she sent him the August 15, 2012 email but claims that the August 17, 2012 email is a forgery. According to her, by August 17, 2012, Debtors were no longer looking at leases in Kansas because of the cease and desist letter they had received from Western Land Services. Mrs. Chapman testified that they never told Mr. Eaton to go to Grove County and that when she spoke to Mr. Eaton on August 20, 2012, she told him to stop working. Additionally, Mrs. Chapman testified at trial that the September 9, 2012 email was another forgery created by Mr. Eaton.

According to Mrs. Chapman, Mr. Eaton decided to come to Illinois on his own. Debtors did not have any work for him and did not promise him any work. He arrived on October 7, 2012, but then she did not see him again until November. It was Mrs. Chapman's testimony that Mr. Eaton would come into town and leave without notice, and that she thought he was staying in Missouri. Mrs. Chapman said that Mr. Eaton "just blew back into town" on December 1, 2012, and offered a $10,000 loan to help Debtors pay their bills and avoid moving to Texas.

Mrs. Chapman agreed that she sent the October 31, 2012 email. She explained that it was a very simple task, just highlighting portions of a map. According to Mrs. Chapman, when Mr. Eaton was in town they would let him hang out in the office, use the phone, and learn about the oil and gas business. She also testified that if Mr. Eaton did generate business from a prospectus he was selling on his own they would help him and pay him accordingly.

Harry Chapman also testified at trial. According to Mr. Chapman, he sent Mr. Eaton the Independent Contractor Agreement and a Non-Disclosure Agreement in August of 2012. It is Mr. Chapman's understanding that Mr. Eaton requested the contract. Mr. Chapman testified that he did meet Mr. Eaton in October and took him to the Miller's apartment. According to Mr. Chapman, Mr. Eaton was just hanging around their office because he wanted to learn the business. Mr. Chapman agreed that the January and February emails introduced at trial appear to be real. He stated that he sent the email to Ben Webster because Mr. Eaton said he had a contact that might lead to business.

Generally, Debtors do not think highly of Mr. Eaton's skill and ability as a landman. It is their belief that he was not able to complete even simple tasks. According to Debtors, when they did provide him work researching heirships he did not admit until later that he did not know what he was doing. Debtors introduced into evidence an internal audit they conducted of the Bankston Creek heirship work. Debtors testified that they were forced to audit all of the invoices on the project and provide Bankston Creek updated bills because of Mr. Eaton's incompetence.

Mr. Eaton and Debtors would also occasionally socialize. The parties all testified that they spent New Year's Eve 2012 at a casino together. Additionally there are text messages from Mr. Eaton to Mrs. Chapman.

In May 2013 the parties had a major falling out. In early Mary the parties had an argument where Mr. Eaton admits he lost his temper. On May 3, 2012, Mr. Chapman drafted a

written warning regarding this argument. Mr. Chapman admits that he did write a recommendation letter for Mr. Eaton. According to Mr. Chapman, he wrote the letter simply because he wanted to get rid of Mr. Eaton and not because he believes that he is a capable landman.

On December 3, 2014, Plaintiffs filed a complaint in Hamilton County, Illinois. The complaint alleged claims under Illinois law for breach of contract, *quatum meruit*, account stated, and a violation of the right to publicity against PLS and ALMM. Plaintiffs sought an injunction against the use by PLS of his name and identity. Plaintiffs alleged $118,871.35 in damages against PLS and ALMM. Additionally, Plaintiffs alleged a claim for breach of contract against Glenda Chapman individually. On October 9, 2015, the Hamilton County Court of Common Pleas entered a default judgment in Plaintiffs' favor. The Hamilton Court awarded $118,871.35 from PLS and ALMM and $14,485.21 from Glenda Chapman. The state court matter did not involve any allegations of fraud.

## LAW & ANALYSIS

The primary issue in this adversary proceeding is whether Plaintiffs' claims for $87,920.68 in unpaid wages and repayment of a $10,000 loan is dischargeable under 11 U.S.C. § 523(a)(2)(A). Section 523(a)(2)(A) of the Code renders nondischargeable any debt "for money, property, services . . . obtained by -- (A) false pretenses, a false representation, or actual fraud…" A creditor must prove the following elements in order to except a debt from discharge due to false pretense or false representation:

> (1) the debtor obtained money or services through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth;
> (2) the debtor intended to deceive the creditor;
> (3) the creditor justifiably relied on the false representation; and
> (4) its reliance was the proximate cause of loss

Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert), 141 F.3d 277, 281–82 (6th Cir. 1998). False pretenses are implied misrepresentations or conduct intended to create a false impression, as opposed to a false representation, which is an express misrepresentation. Haney v. Copeland (In re Copeland), 291 B.R. 740, 761 (Bankr. E.D. Tenn. 2003) (citing Ozburn v. Moore (In re Moore), 277 B.R. 141, 148 (Bankr. M.D. Ga. 2002)). The party seeking to establish an exception to discharge has the burden of proving each of these elements by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291 (1991). "A central purpose of the Bankruptcy Code is to give 'honest but unfortunate debtor[s]' a 'fresh start.'" Pazdzierz v. First Am. Title Ins. Co. (In re Pazdzierz), 718 F.3d 582, 586 (6th Cir. 2013) (quoting Grogan, 498 U.S. at 286-87). Therefore, "exceptions to discharge are to be strictly construed against the creditor." Rembert, 141 F.3d at 281.

Additionally, actual fraud as used in § 523(a)(2)(A) is not limited to misrepresentations. Mellon Bank, N.A. v. Vitanovich (In re Vitanovich), 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001). "When a debtor intentionally engages in a scheme to deprive or cheat another of property or a

5

legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code." Id.

In bankruptcy court unfulfilled promises are not enough to support a claim of nondischargeability under § 523(a)(2)(A). See Heintschel v. Smith (In re Smith), No. 12-34213, Adv. No. 12-3210, 2013 WL 522919, *1 (Bankr. N.D. Ohio Feb. 12, 2013). A subsequent breach of a promise or breach of contract "is not by itself proof that the contract was made with the intent to defraud." Waitman v. Steed (In re Steed), 157 B.R. 355, 358 (Bankr. N.D. Ohio 1993).

Plaintiffs' claim that the Debtors intentionally defrauded him by promising him work as a landman and then never paying him for his services. Debtors counter that Mr. Eaton came to Illinois on his own and they allowed him to observe and learn their business. It is clear that the Debtors and Plaintiffs had some sort of relationship. The parties agreed that Mr. Eaton was originally to look up leases in Kansas. Additionally, Mr. Eaton conducted heirship research for ALMM in April of 2013. Mr. Eaton received compensation for the heirship work he did. Additionally, the parties clearly would socialize together and were in contact from August 2012 through May 2013. What was not shown at trial was a specific employment relationship that the parties agreed upon or a scheme to defraud Plaintiffs in order to receive a free labor.

Here, Plaintiffs' have not meet their burden of proving a violation of 11 U.S.C. § 523(a)(2)(A) by a preponderance of the evidence. From a review of the testimony and documents, there is not enough evidence to support a claim of intentional fraud to steal free labor from Mr. Eaton. A great deal of conflicting testimony was presented at trial regarding the relationship of the parties. Debtors explanations regarding their contact with the Debtor was inconsistent. However, other than Mr. Eaton's testimony and invoices he created in advance of the Hamilton County litigation there is no evidence supporting a specific agreed upon employment relationship. Neither his testimony nor the invoices were compelling.

The evidence only supports that the parties agreed to that Mr. Eaton would run heirship in April for Bankston Creek, work for which, Mr. Eaton received $3,588 in compensation. Additionally, even if, Plaintiffs proved that there was an agreed upon employment relationship beyond the heirship research that would only support a claim of breach of contract and Plaintiffs' claims would still be dischargeable in this bankruptcy action as there was no evidence supporting fraudulent intent at the time. "A broken promise alone will not establish the existence of any intent to deceive." EDM Machine Sales, Inc. v. Harrison (In re Harrison), 301 B.R. 849, 854 (Bankr. N.D. Ohio 2003).

In sum, based upon the credibility of the witnesses and the testimony at trial, Mr. Eaton failed to prove that there was an agreement for him to perform the work that he performed with the exception of a few noted examples. Additionally, based upon the credibility of the witnesses and the testimony at trial, Mr. Eaton failed to prove either that the work he performed was competently done or that Debtors had the intent not to pay him at the time any agreed upon work was performed. Accordingly, Plaintiffs' claim that $87,920.68 in unpaid wages is nondischargeable under § 523(a)(2)(A) is denied.

In addition, Plaintiffs claim that Glenda Chapman made fraudulent misrepresentations regarding the purchase of a mineral deed that induced Mr. Eaton to provide a $10,000 loan. According to Mr. Eaton, he made the loan because Mrs. Chapman told him that if they went forward with the mineral deed she would be able to pay him for his work. Mr. Eaton's testimony on this point was unpersuasive. Mrs. Chapman states that Mr. Eaton loaned them the money when he learned that they would have to move to Texas because there was not enough work in Illinois. He did not want them to leave, hoping to latch onto an employment opportunity. This testimony was credible. "The failure to pay in breach of loan agreement is not enough to except a debt from a bankruptcy discharge." Vogt v. Hastings (In re Hastings), No. 13-34506, Adv. No. 14-3022, 2015 WL 1598055, *3 (Bankr. N.D. Ohio April 6, 2015). It is clear that Mr. Eaton knowingly loaned Debtors $10,000. There is no credible evidence that Debtors then used that money to purchase a mineral deed or made the representation that they would. There is only evidence of nonpayment of the loan. There is no evidence that Debtors did not intend to repay the loan at the time it was made. Absent more, the $10,000 loan is dischargeable.

This adversary proceeding arose in the Debtors' personal bankruptcy. The Debtors conducted their oil and gas business through two Delaware LLCs, PLS and ALMM. Accordingly, Plaintiffs included claims of for piercing the corporate veil in their complaint. The court believes it is unlikely that they would be able to make the necessary showing to pierce the corporate veil. However, ruling on the issue is moot because Plaintiffs were not able to satisfy the burden for proving claims under § 523(a)(2)(A).

## Conclusion

Plaintiffs have not satisfied their burden of showing by a preponderance of the evidence that the claims are nondischargeable under 11 U.S.C. § 523(a)(2)(A). Accordingly, the court **GRANTS** judgment in favor of Debtors, Harry Chapman and Glenda Chapman, on all of Plaintiffs' claims. A separate order will be entered simultaneously with this opinion.

It is so ordered.

#     #     #

**Service List**:

**Brian T. Angeloni**
**David S. Nichol**
Roderick Linton Belfance LLP
50 S. Main Street
10th Floor
Akron, OH 44308

**James F. Hausen**
Bates and Hausen, LLC
215 E. Waterloo Road Suite #17
Akron, OH 44319